IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JIE TANG,<br><br>    Plaintiff,<br><br> v.<br><br>SCHEDULE A DEFENDANTS,<br><br>    Defendants. | Civil Case No.: 2:25-cv-01850-CCW |

**<u>DECLARATION OF CHINA LITIGATON EXPERT MR. ZHI HAN</u>**

I, Zhi Han, declare and state as follows:

1. This declaration is based upon my personal knowledge of the facts stated herein or on the business records that were made at the time or in the regular course of business. If called as a witness, I could and would testify to the statements made herein.

**A.  I have extensive experience in US-China IP litigations.**

2. I am an intellectual property litigation partner at the Guangdong Zhongkuan Law firm specializing in U.S.-China IP litigation. I earned my law degree in 2015 from the Shantong University in Guangdong Provine, China and have practice IP litigation in China for more than 10 years. I have assisted dozens of patent,

1

trademark, and copyright litigations in the United States. A true and correct copy of my resume is attached to this declaration as Exhibit A.

3. More specifically, I have worked with U.S. lawyers to litigate cases in the Western District of Pennsylvania and the Northern District of Illinois. For example, in 2025, I have assisted at least four IP infringement cases before the U.S. District Court for the Western District of Pennsylvania (25-cv-01850, 25-cv-02009, 25-cv-01951, and 2:26-cv-00142), in addition to dozens of cases before the U.S. District Court for the Northern District of Illinois.

4. I have extensive experience negotiating settlement with China IP infringers, verifying the authenticity of documents produced by China infringers, and analyzing their claims of prior art, prior sales, and independent creation.

5. I have negotiated hundreds of settlements with IP fingers operating in China. During these negotiations, China IP infringers routinely provided me with (1) webpage "screenshots" showing purported prior sales of related or identical-looking products and (2) statements about their "low sales"—to try to invalid Plaintiff's IP and exact a low settlement.

6. Most of these "screenshots" and "sales records" turned out to be doctored submissions. For example, it is commonplace to buy photoshopped webpage screenshots from such websites as Taobao.com and TMall.com for $10 to $80

2

dollars apiece. For the Court's references, true and correct copies of various advertisements on Tmall.com (and their English machine-translation) for generating such photoshopped webpages and screenshots "within only two minutes" and "to the full satisfactions of customers" are provided as Exhibits B and C in Dkt. 44-1.

7. For another example, to verify the authenticity of a purported screenshot, I often asked the IP infringers to provide the links to the original webpages, they almost always could not, claiming that the links had been removed.

8. But if the links had been removed, I asked these IP infringers (i) how they were able to generate the screenshots, and (i) when they generated the screenshots. The IP infringers almost never answered.

   **B.  The proffered "sales records" by Defendant are untrustworthy.**

9. On or about February 3, 2026, Mr. Andy Liu, the Counsel for Plaintiff asked me to investigate various purported sales records provided by Defendant Longyan.

10. At Mr. Liu's request, I examined **Exhibits A-D** attached to the declaration of Ms. Zhiyun Jiang. After a thorough examination and investigation, I find Defendant's claim that it sold sweatshirts with the Florida State Stadium design and the Penn State Stadium design in 2023 to be untrustworthy for the following reasons.

11. **First**, it is odd that Defendant "sold" more than 94% of the accused products in

2023 alone, but with next two years account for only 5% of the total sales. Defendant offered no explanation for large sales disparity.

12. On a related note, at the January 6, 2026 preliminary injunction hearing, Defendant appeared to have mistakenly believed that the statute of limitation for copyright infringement is only two years, until corrected by Plaintiff's Counsel Mr. Liu that the statute of limitations is in fact three years.

13. Thus, it appears that Defendant Longyan had a strong incentive to modify its "sales records" to avoid paying more damages for the years of 2024 and 2025 by changing the order history of 90% of the relevant orders to make it appear that those orders were placed in the year of 2023.

14. **Second**, from my past negotiations with IP infringers operating in China, I know that IP infringers routinely provide forged sales records, and that "sales records" from such e-commerce platform as Shoplazza can be easily manipulated.

15. As background, the Shoplazza company is an ecommerce technology company headquartered in Shenzhen, China. The Shoplazza company allows a user to setup and maintain an online store with "full control." https://helpcenter.shoplazza.com/hc/en-us/articles/17769522733209-Shoplazza-Admin-Quick-start-guide-to-store-setup-and-navigation

16. On the Shoplazza platform specifically, a listed product has a unique (i) product id, a required (ii) product tile, and an optional (iii) product image.

17. The required product title corresponds to the "Title," and the optional product image correspond to the thumbnail called "Media," as shown in Defendant's **Exhibits A-D**.



Relevant portion of **Exhibit A** attached to the declaration of Ms. Zhiyun Jiang, where the product id is not shown.

18. The product id is assigned by the Shoplazza's database management system and cannot be changed once a product listing is created in a Shoplazza database.

19. The product title and product image, however, can be easily modified. In

addition, virtually all other information about a listed product can be changed, For example, a marketing manager can even change a past order's creation time, price, the buyer's name, the shipping address, and so on.

20. For example, the Shoplazza company provide a step-by-step tutorial on how to edit almost any information about a *past* order at https://helpcenter.shoplazza.com/hc/en-us/articles/4407128850201-Orders-Viewing-and-editing-order-details#orders-viewing-and-editing-order-details-0-0

21. A true and correct copy of this tutorial is provided as **Exhibit C** attached to this declaration.

22. While it is unclear to me why Shoplazza allows a seller to change past sales records (as it would risk generating inaccurate records), the Shoplazza platform, to this date, provides this functionality to its user.

23. As a result, an item's sales records on Shoplazza can be manipulated or even completely repurposed. A marketing manager may alter a past sales records—by changing the product title, changing the product description, changing the product image, and changing the model numbers to reflect new or entirely past sales records.

24. **That is, a search for the product title "Penn State Stadium Crewneck Sweatshirt" against Defendant's Shoplazza database could very well return**

**sales history of a product that had a different title in the past or even a product that had nothing to do with a Penn State Stadium Crewneck Sweatshirt (e.g., a pair of Nike shoes), as long as that product's current title in the corresponding sales records has been altered to include the phrase "Penn State Stadium Crewneck Sweatshirt" or the like.**

25. Academic research confirms this dynamic nature of e-commerce product listings. For example, a published study of Amazon's "review hijacking" practices explains how marketing professionals can hijack existing product pages and replace their details—title, description, and images—with those of a different product, while retaining the earlier reviews. This shows that e-commerce product records are unstable over time and therefore not trustworthy as prior art.

26. Attached hereto as Exhibit B is a true and correct copy of the article entitled Identifying Hijacked Reviews, arXiv preprint (2021), available at https://arxiv.org/pdf/2107.05385.

27. IP infringers in China have taken advantage of this feature of the Shoplazza database system to avoid liability when they are sued. When negotiating settlement with IP infringers operating in China, I have been flooded with "sales records" allegedly invaliding certain IP in dispute. For example, on numerous occasions, I was provided with past "sales records" that, if true, would invalid a

U.S. design patent or a U.S. copyright registration.

28. In most of these cases, however, these claims of prior sales were false. For example, when I asked these infringers to provide actual photos taken in the past of the accused products, I almost never received any. For another example, during some settlement negotiations, some sellers later admitted to me that no such past sales even occurred, and that their records were modified to obtain a lower settlement payment.

29. In addition, IP infringers have used past "sales records" generated using such e-commerce platforms as Shoplazza to create false use specimen to support their U.S. trademark applications. The United States Patent and Trademark Office has published numerous advisories on IP infringer's use of falsified "sales records" to essentially make false statements before federal agencies.

30. A true and correct copy of one of the falsified "sales records" advisory issued by the United States Patent and Trademark Office is attached as **Exhibit D** to this declaration.

   **C. My conversation with the Shoplazza platform's sale representative confirmed that its sales records are unreliable.**

31. On February 9, 2026, I inquired a customer service representative of the Shoplazza platform about whether I could obtain a proof of past sales, because I would like to become a seller of a particular product using the Shoplazza

platform and to claim that I have prior sales history of that particular product, if a patent is asserted against the particular product I would like to sell.

32. In other words, I asked a Shoplazza platform's sale representative about whether I could generate a past sales record, even though I had no such past sale.

33. The Shoplazza platform's sale representative stated to me that "our [Shoplazza] platform can assist you to accomplish what you need."

**D. Defendant Longyan has made inaccurate representations in the past.**

34. After the January 6, 2026 hearing, Mr. Andy Liu, the Counsel for Plaintiff Jie Tang asked me to investigate similar claims of prior sales by Defendant Longyan based on a "screenshot" of an, what Defendant Longyan claimed, identical design shown on a TikTok page.

35. After a thorough investigation, I found Defendant's claim to be untrustworthy and filed a declaration with this Court explaining my reasoning. Dkt. 44-1.

36. First, I could not locate the original webpage which Defendant's "screenshot" purportedly shows. I searched the Tiktok.com (where Defendant said the corresponding webpage was hosted) but could not locate the corresponding Tiktok webpage.

37. Second, I understand that to this date (February 9, 2026) Defendant has also not provided Mr. Andy Liu nor the Court with a copy of the screenshot and more

importantly, *the link to the original webpage*, even though Mr. Liu has repeatedly requested the screenshot from Defendant's counsel.  Nor has Defendant provided any information about *who* took the screenshot and *when* the screenshot was taken.

38. The lack of critical information like this indicates that proffered "screenshot" by Defendant is untrustworthy and probably forged.

39. Next, the testimony by the "company representative" at the preliminary injunction hearing was untrustworthy.

40. The "company representative" claimed to be Ms. Zhiyun Jiang, the marketing manager of Defendant Longyan. Ms. Jiang, however, offered no details about the sales of the accused products other some random, barebone numbers.

41. The "company representative "provided her last name only, not her full legal name or any work address or work phone number.

42. When asked of which company she was an employee, the "company representative" did not answer, claiming that she does not understand English. Then, the "company representative" refused to answer any other questions from Mr. Liu, once again claiming that she does not understand English.

43. This is contrasted with the "company representative" unequivocal answers to the defendant's own questions about prior sales at the preliminary injunction hearing

and with the Defendant Longyan's six-page assertions about how its had sold accused products in the past.

44. Ms. Jiang's current declaration is dubious at best and probably made with reckless disregard of its truth.

45. At bottom, how could Ms. Jiang who concededly did not understand or speak English at all and did not know the name of her employer on January 6, 2026 now testifies in great details exclusively in the English language about what products Defendant Longyan has or has not sold in 2023?

**E. Conclusion.**

46. Based on my experience, my careful review of the Exhibits A-D at issue, my interactions with the customer service representative of the Shoplazza platform, and my experience settling IP infringement claims with IP infringers operating in China, I conclude that the records identified by Defendant Longyan are not reliable evidence of prior sales. A product's description, image, and thumbnail can be, and in fact routinely are, changed by a seller using the Shoplazza platform.

47. As a result, a current search using a product's title often display entirely different products over time, while still retaining the current product title and thumbnail. Because of this instability and the risk of misrepresentation, these "sales records"

are often not considered reliable evidence to resolve IP disputes involving sellers using the Shoplazza platform.

48. For these reasons, it is my opinion that neither the Exhibits A-D cited by Defendant Longyan do not prove that Defendant Longyan sold sweatshirts with the Florida State Stadium design and the Penn State Stadium design in 2023.

I declare under penalty of perjury under the law of the United States that the foregoing is true and correct.

Date: February 9, 2026                                  Respectfully submitted,

*zhiHan*

_____

Zhi Han